No. 25,909.

CEDAR RAPIDS SAVINGS BANK, *Appellee*, v. SAM ZEFF, *Appellant*.

SYLLABUS BY THE COURT.

BILLS AND NOTES—*Fraud in Procurement—Holder in Due Course—Evidence.*
The evidence in an action by the holder to recover from the maker of prom-
issory notes, considered, and *held*, that while defendant's evidence was suf-
ficient to sustain the defense that the notes were procured by fraud, it es-
tablished the fact that the holder was a holder in due course.

Appeal from Wyandotte district court, division No. 3; WILLIAM E. Mc-
CAMISH, judge. Opinion filed November 7, 1925. Affirmed.

*Rush L. Fisette* and *Charles A. Stratton,* both of Kansas City, for the ap-
pellant.

*H. G. Wierenga,* of Kansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by the holder of promissory notes
to recover from the maker. The defense was, the notes were with-
out consideration, the payee procured them by fraudulent repre-
sentations, and the holder was not a holder in due course. A de-
murrer was sustained to defendant's evidence, and he appeals.

The Serenado Manufacturing Company is located at Cedar Rap-
ids, Iowa. It manufactures and sells talking machines. Part of its
banking business is done with the Cedar Rapids Savings Bank, the
plaintiff. Defendant is the proprietor of a small dry goods and shoe
store at Rosedale, Kan. On July 22, 1921, one of the company's
salesmen procured from defendant a contract whereby defendant
acquired the privilege of selling Serenado talking machines on stated
terms. The notes, five in number, for $55 each, due respectively in
two, three, four, five, and six months from date, were attached to
the contract. The company was authorized to detach the notes
when the order contained in the contract was approved and the first
machine was shipped. The contract was approved, a machine was
shipped to defendant by express, and on July 30 the notes were in-
dorsed and delivered to plaintiff. When the bank took the notes,
it gave the company credit on account for seventy-five per cent of
the face of the notes, entered the transaction on the books of its loan

Bills and Notes, 8 C. J. § 1358; 6 A. L. R. 1667; 18 A. L. R. 18; 3 R. C.
L. 1033.

department, and carried the notes as collateral security for advances to the company. At the time suit was commenced, obligations of the company secured by the notes were undischarged. These obligations were further secured by other notes given the company by its customers and indorsed and delivered to the bank. After the bank acquired the notes, the company was interested in them to the extent that payment would *pro tanto* discharge the company's obligation to the bank and the company would be entitled to any surplus which might remain after the bank was fully paid. The notes sued on were indorsed "Serenado Mfg. Co., by R. R. McDougall." When the notes were given the company was a partnership. When suit was commenced the company had been incorporated. Before incorporation, notes which the bank accepted from the company were indorsed by McDougall pursuant to authority from the partnership, and after incorporation he was connected with the company in an official capacity.

On July 25 the company acknowledged receipt of defendant's contract, and made suggestions relating to an advertising campaign to be conducted according to the plan contemplated by the contract. Defendant replied by letter proposing a course of conduct not in accordance with the contract, and indicating a conception of defendant's relation to the company at variance with the contract. The contract provided for a machine to be shipped to defendant f. o. b. Cedar Rapids. When defendant was notified by the express company of arrival of the machine at Rosedale and of the amount of charges for carriage, he wrote the following letter to the company:

"The express is $3.24 and your salesman said would not have to pay a cent and if you want to act as your agent you will have to stand express."

The company responded in part as follows:

"In your letter of August 4 you made the statement that our salesman said that you would not have to pay a cent. He never told you anything of the kind. Your contract provides, and you knew it at the time you signed it, that all merchandise under this contract is delivered to you f. o. b. point of shipment, and what the salesman told you was that your first note was not due for two months, in order to give you the opportunity, with our coöperation under our advertising service, to sell several of these machines before your first payment became due. . . .

"We accepted these notes in settlement of the account. We have sold the notes in the due course of business to the Cedar Rapids Savings Bank of this city, and they will expect you to pay these notes in accordance with their

terms. Consequently, Mr. Zeff, you have bought something, and the thing for you to do is to join hands with us and make money out of this proposition."

Defendant took his trouble to the cashier of the Commercial State Bank of Rosedale, whom he was in the habit of consulting. The cashier wrote a letter to the company, stating, among other things, that defendant could not read, and could not write except to sign his name, that the company's salesman had represented defendant was signing a receipt for goods he would receive, that defendant did not know he was signing notes, or what he was signing, and that the bank carried a loan on everything defendant possessed. The cashier also assumed the rôle of monitor, and advised the company to recall the machine, because a number of business men of Rosedale would get behind Sam and see that he was treated right. The manufacturing company replied in part as follows:

"Now, he has claimed to you that he can only write his signature. We have a letter from him dated August 4, 1921, and if that letter wasn't written by Sam Zeff, we will forfeit the best box of cigars that can be bought in Kansas City. . . .

"Now, the simple facts of the case are, his contract is a sound contract, it is based on sound business principles, and what that contract covers is worth every penny of the $275 he contracted to pay, and we cannot believe that Sam would sign a paper and hand it to an absolute stranger without knowing what that paper contained. . . .

"We, however, want to thank you for your communication, and we hope that this matter is going to be fixed up without any controversy that will get into court. But we have got the goods on Sam."

Evidence was given at the trial that defendant could not write. He testified that some one other than himself wrote the letter of August 4, and his attorney made the statement when offering the letter in evidence that the handwriting of the letter and defendant's signature to it were dissimilar. Extent of the dissimilarity is not disclosed, but it is clear the company had no intimation that defendant could not write before it received the letter from the cashier of the Rosedale bank. Plaintiff was then holder of the notes.

There was evidence sufficient to go to the jury that the company's title to the notes was defective, because the maker's signature was procured by misrepresentations made by the company's agent. The company, however, was engaged in legitimate business, conducted in the usual way. The fact that the contract which defendant signed was based on sound business principles is not disputed, and the com-

pany guaranteed return of the aggregate amount of defendant's notes, with interest, if after fair and reasonable effort, put forth according to the company's methods and directions, defendant did not sell a stated number of machines within a stated time. There is no evidence warranting an inference that the company knew of the misconduct of its agent when it received from him the contract and notes, or when it negotiated the notes to plaintiff. It requires but slight familiarity with corporation financing to know that manufacturing companies obtain accommodations from banks by using customers' notes as collateral security. The transaction by which plaintiff acquired the notes sued on was perfectly regular. Proof of fraud in procuring signature to a note is no proof that a holder to whom the note has been negotiated had notice or knowledge of the fraud (*Farmers State Bank v. Brenneke,* 118 Kan. 251), and plaintiff was entitled to recover unless it took the paper in bad faith.

In defendant's brief appears the following:

"In the case at bar, both the cashier of the bank and the manager of the Serenado Company testified that the bank had no knowledge of the fraudulent manner in which these notes were procured, or of the method of doing business, but the jury was at liberty to disbelieve this evidence, . . ."

The testimony referred to was contained in depositions taken at Cedar Rapids and offered by defendant. In the case of *Pioneer Trust Co. v. Combs,* 117 Kan. 89, 230 Pac. 302, the court said:

"Where because of fraud in the inception of a note the plaintiff has the burden of proving that he is a holder in due course, the question whether he has met the requirement is ordinarily one for the jury. [Citation.] There is, however, an exception to this general rule, recognized by this and many other courts, which has been thus expressed: 'Unless that evidence is so clear and unequivocal as to leave no room for difference of opinion among fair-minded men.' [Citation.] That situation arises where the plaintiff accounts for his good-faith ownership by evidence which is not intrinsically improbable, and is not contradicted or impeached by, or inconsistent with, other evidence or inferences fairly to be drawn therefrom. . . .

"The evidence in behalf of the plaintiff having been given by deposition, there is no room to suppose—assuming such supposition otherwise to be tenable—that from something in the appearance and manner of the witnesses the jury discredited their statements. There was nothing intrinsically improbable in the testimony, which described an ordinary business transaction. The plaintiff consequently met the burden of proving it was a holder in due course, and judgment should have been rendered in its favor, unless the facts as developed by the evidence tended to show (and therefore warranted a finding) that it took the notes with actual knowledge of the fraud or with knowledge of such facts that its action in taking them amounted to bad faith." (pp. 90, 92.)

The result is, defendant's evidence established plaintiff's right to recover unless there were circumstances showing bad faith.

When the company as a partnership received its agent's report of the transaction with defendant, it opened an account with defendant. On this account defendant was charged with the contract and the equipment supplied to him, and was credited with the notes as bills receivable. Afterwards the company incorporated. When the depositions were taken, the corporation had possession of the original books showing defendant's account, and the account stood just as it did when the items were entered. The proof was that the corporation was still indebted to plaintiff, and plaintiff still held the notes as collateral to that indebtedness. Defendant seems to think there is something about this which destroys plaintiff's title to the notes. It is true, nobody testified specifically that the only change was in form of organization and the corporation simply stepped into the shoes of the partnership, but it is inferable from the testimony that such was the case.

Defendant calls attention to two letters which he received from the company, and which he contends make the case of *Security Co. v. Low*, 112 Kan. 153, 210 Pac. 190, applicable to the controversy. The first letter was dated September 10. It referred to defendant's knowledge, previously acquired from the company, that his notes had been transferred to the Cedar Rapids Savings Bank, reminded him of the date when the first one fell due, and expressed hope he would take care of it so the bank would have no cause to complain. The second letter was written after the first note had been dishonored. The letter stated the bank had informed the company the note had been returned unpaid, and contained the following paragraph:

"Now what we desire to know is, are you going to recognize your obligation under your contract with us and your liability under these notes, or will it be necessary to enforce collection of these notes by suit? We are inclosing a stamped envelope for your reply."

In the case of *Security Co. v. Low*, it was shown that correspondence passed between the holder and the payee of the notes sued on, subsequent to the holder's claimed acquisition of them. Most of this correspondence was conveniently absent from the holder's files, and was not forthcoming at the trial. Enough of it was produced to show the holder was taking instructions from the payee, the holder's course of conduct was directed by the payee, and action to recover on the notes was withheld until the payee exhausted efforts to induce

the maker to go ahead with the original contract or enter into a new one. The holder contended he had purchased the notes outright, and it was held the foregoing facts tended to show he did not own the notes as a *bona fide* holder. We have no such case here. As indicated above, the bank became holder in due course before the com-- pany knew there was anything wrong with the notes. The notes were not purchased outright, but were taken as collateral security, and the ordinary course of business required the bank to notify the payee that its collateral was dishonored. Payment of the notes would reduce the company's obligation to the bank, and the company was properly concerned about what defendant intended to do, both on account of its contract with defendant, and because payment of the notes would reduce the company's indebtedness to the bank.

The cashier of the Rosedale bank undertook to catechize the Cedar Rapids bank with respect to how it acquired the notes, whether as collateral or by indorsement without recourse, and whether it was the true owner of the notes. The Cedar Rapids bank did not reply. It does not appear whether this naïve fishing expedition was undertaken before or after the cashier sought to induce the company to rescind by intimating Zeff was not financially responsible and by threat that resistance to enforcement of Zeff's contract would be made a community affair of Rosedale business men. Whenever it occurred, plaintiff's attitude toward the paper was very soon disclosed, by forwarding the first note to the Rosedale bank for collection.

The deposition of plaintiff's cashier and the deposition of the company's general manager, W. H. Conant, were taken at Cedar Rapids. The record does not disclose who represented plaintiff in this proceeding. The general manager wrote plaintiff's attorney at Kansas City the following letter:

"We have procured a copy of deposition taken in the case of *Cedar Rapids Savings Bank v. Sam Zeff,* from the attorney, and inclose same herewith. The original was mailed to the clerk of the north city court, Kansas City, Kan.

"If you have any criticisms or suggestions to make, we shall be glad to hear from you. Yours very truly, SERENADO MFG. Co.

W. H. CONANT."

This letter, whether considered by itself or in connection with all the other matters regarded by defendant as "circumstances," would not support a finding that plaintiff was not owner of the notes, or that plaintiff was not a holder in due course. Such a finding, if re-

turned, would not be based on evidence, but on conjecture, or rather, on suspicion.

The ruling sustaining the demurrer to defendant's evidence is affirmed, and the district court is directed to enter judgment in favor of plaintiff.

HARVEY, J., dissenting.